[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This marital dissolution action was commenced in January, 1996. During its pendency, Thomas Peltzer commenced a related civil action against Karen Peltzer. That matter, which originally bore the docket number CV 96-0564976, was later consolidated with the marital dissolution action. This Memorandum encompasses both claims. Based on the evidence adduced at trial, the court makes the following findings and orders. CT Page 5843
The allegations of the marital dissolution complaint have been proven as true. Accordingly, a decree may enter dissolving the marriage on the basis of its irretrievable breakdown.
Karen Peltzer is forty-four years of age. Since June, 1996, she and Lindsey have resided at 13 Wentworth Park, Farmington, Connecticut, a home she purchased after the parties separated. She has a two-year associates degree and has been certified as a dental hygienist. Though she worked in this capacity for a period during the marriage, she has not held outside employment since the parties separation in 1996, asserting that difficulties attendant to the pending dissolution and Lindsey's care needs have made outside employment unsuitable for her.
During the course of these proceedings, Mrs. Peltzer underwent psychological evaluation. In his report, Adam Jaffe, Ph.D. noted that Mrs. Peltzer, "tends to deny problems and is not very introspective or insightful about her own behavior." Defendant's Exhibit Q, Psychological Report. Elsewhere in his report, Dr. Jaffe noted: "It appears that Ms. Peltzer has some chronic and pervasive problems that promote perceptual inaccuracy and/or mediational distortion. Ms. Peltzer has a tendency to project her feelings onto others as bell as to see things as she wishes them to be. This is likely to be most prominent under times of stress and contributes to difficulties in reality testing. These difficulties often produce behaviors that are inappropriate for the situation. The client's tendency to distort reality under stress is considerable and suggests that she will have difficulty maintaining adequate adjustment over long periods of time." Id. While determining that Mrs. Peltzer did not meet the diagnostic criteria for any specific personality disorder, Dr. Jaffe found that her personality configuration appeared to be composed predominantly of features that are most related to DSM 301.50, Histrionic Personality Disorder. On the positive side, Dr. Jaffe found that Mrs. Peltzer, "has some ability for human warmth and relationships, an outgoing and social nature, an ability to picture happy and healthy family and friend relationships, an ability to desire and to achieve some level of intimacy with others, a sporadic ability to process her emotions in a controlled way and to comfort herself, and an ability to be a caretaker for others." Id. Based on his findings, Dr. Jaffe recommended that any access schedule concerning Lindsey be detailed and unambiguous. He also recommended therapy and parenting education for Mrs. Peltzer. CT Page 5844
Dr. Peltzer is forty-seven years old and resides in the former marital home at 11 Langley Park in Farmington. He has a four year college degree and a degree in dentistry from the University of Connecticut. Since 1979, he has practiced dentistry, first with a large dental office., and for the past several years in his own practice located at 87 East Street in Plainville. Dr. Peltzer's financial affidavit dated January 29, 1999 shows gross weekly employment income of $6,000, a reduction from previous years earnings.
Dr. Peltzer was psychologically tested by Frank J. Stoll, Ph.D. in 1994 and by Adam Jaffe, Ph.D. in 1997. At the time of the earlier evaluation, Dr. Peltzer had criminal larceny charges pending against him. While it's unclear whether the evaluation was done at the behest of his defense counsel, it is apparent that the precipitating factor in the evaluation was the pendency of the criminal matters.
In the summary portion of this earlier evaluation, Dr. Stoll stated: "Personality testing indicated an individual who is suffering from considerable depression and anxiety at the present time. Although the patient's vulnerability to anxiety and depression has a genetic loading in a familial history of depression (on the maternal line), these symptoms can also be seen as exacerbations of his long-term characterological impairment. Dr. Peltzer's responses to the psychological testing indicate an individual with an angry, aggressive and competitive facade which is used to cover over intense feelings of inadequacy and fearfulness. The patient seeks constant self-aggrandizement in the form of social success and prestige, and he has built an emotional wall around him so that others cannot get close." Plaintiff's Exhibit 6, Psychological Evaluation of Frank Stoll, Ph.D. Based on his testing and clinical interview, Dr. Stoll diagnosed Dr. Peltzer has having the following psychiatric disorders: Kleptomania; Manor Depressive Disorder; Generalized Anxiety Disorder; and, Personality Disorder NOS.
In the 1997 evaluation, Dr. Jaffe concluded that, "Dr. Peltzer's emotional limitations and deficits include a defensive and non self-reflective nature, difficulty dealing with affect and his internal turmoil, dynamic conflict between his dependent nature and desires for independence, struggles with excessive underlying hostility, severe limitations in intimate relationships, insecure and superficial self identity, and a preoccupation with appearances. Dr. Peltzer's strengths include CT Page 5845 an apparent concern, and preoccupation with, the welfare of his daughter. In addition, while he is clearly quite angry at his wife, he appears to have the ability (at times, and with some effort) to look beyond this anger in order to consider his daughter's welfare (as evidenced, in part, by his acknowledgment that his daughter is strongly attached to her mother and needs considerable contact with her.). Additionally, this client has the fortitude necessary to optimistically work hard toward external goals." Defendant's Exhibit N, Psychological Evaluation by Dr. Jaffe. Dr. Jaffe continued, "Given the above described issues, it appears that a primary parenting arrangement would not be ideal for this client or his daughter. However, a parallel parenting arrangement involving parenting time and some parenting responsibilities in parallel with his spouse, without primary responsibility for his daughter, may be helpful." Id. Dr. Jaffe found that although Dr. Peltzer did not meet the diagnostic criteria for any specific personality disorder, his personality configuration appeared to be composed predominantly of a Dependent Personality Disorder, and Obsessive Compulsive Personality Disorder.
Since 1994, Dr. Peltzer has been treating with a psychiatrist, Cynthia Conrad, M.D. Dr. Conrad testified that when she first met Dr. Peltzer in 1994 he was in a depression which related both to his episodes of stealing and to marital disharmony. Though she first found Dr. Peltzer to be circumspect, guarded in revealing his emotions, she stated that he has made significant progress so that he is now more open and trustful. She indicated her belief that Dr. Peltzer has genuine affection for Lindsey as a person as opposed to Lindsey simply being an extension of himself. Though Dr. Conrad saw Dr. Peltzer weekly through 1997 and monthly in 1998, she now treats him only on an as-needed basis.
Lindsey will be ten years old on July 26, 1999. She is completing fourth grade at the Renbrook School. During her lifetime, Lindsey's primary care giver has been Mrs. Peltzer. There have been times during the marriage when Dr. Peltzer has been emotionally unavailable to Lindsey, either because of the energy required of his work, or due to his own psychological makeup.
Lindsey is not a trouble-free child. Trial evidence suggests that she has had difficulties remaining in focus in her school work and with oppositional behaviors, and that she suffers from CT Page 5846 depression and poor self-esteem. A psychological evaluation ordered by the court and done by Wilbur Nelson, Ph.D. earlier this year reveals Lindsey to have a well established general fund of information, vocabulary, social judgment, and verbal abstract reasoning, with notable cognitive deficits involving attention and concentration. These findings are not inconsistent with observations made by school personal. Dr. Nelson observed that testing revealed Lindsey to be experiencing substantial anxiety and depression but also taking great pains to hide her feelings. Dr. Nelson stated, "It is likely that Lindsey is not fully aware of her emotions, which is one reason that she does not show them. However, even when she is aware, she perceives a strong risk in being direct about her feelings. The perceived risk involves disapproval, rejection, and abandonment. In all likelihood, the events leading up to her parents' separation, as well as the continuing conflict, have contributed to Lindsey's implicit notion that the best course of action is to avoid making any waves. It should be noted that her inhibition of emotional expression has negative consequence for her, as uncomfortable feelings build up inside, and they become increasingly frightening to express." Counsel for the Minor Child's Exhibit 2, Psychological Report. Dr. Nelson recommended that Lindsey engage in therapy in an environment sufficiently safe for her to express and act out her feelings, that at some point in the future Lindsey's therapy include the opportunity to talk more honestly with her parents about her feelings, and that a medication consultation be arranged. Additionally, Dr. Nelson recommended that those who interact with Lindsey assist her to process information with visual supports instead of relying solely on auditory cues, and that steps be taken to reduce Lindsey's excessive reliance on adults for help with her academic work.
The court appreciates the thoroughness of Dr. Nelson's evaluation and credits his findings. They are consistent with anecdotal trial evidence. Lindsey has been caught in a bitter, acrimonious and selfish custody contest between her parents, neither crediting or validating the other as parent; each too willing to find fault and place blame on the other. And in this regard, Ms. Peltzer's behavior trumps her husband's. She has consistently frustrated his access to Lindsey, engaged Lindsey inappropriately in conversations on adult topics heedless of the fear this may bring, and has been largely blind to Lindsey's developmental and educational needs. Nevertheless, as a consequence of the primacy of Mrs. Peltzer in Lindsey's life and her generally greater emotional availability, Lindsey is deeply CT Page 5847 bonded to her mother.
While this matter has been pending, the issue of parenting was referred to James Black, M.D. for evaluation on two separate occasions, and this generated two reports, once in 1997 and the second in 1998. The court is aided in its decision-making by the comprehensiveness of Dr. Black's work. In his 1998 report, Dr. Black noted that Dr. Peltzer's mental status had changed somewhat since the earlier evaluation. Dr. Black stated: "While he continues to lack emotional expression, he is clearly less guarded and cautious. No longer does Dr. Peltzer quote third party authority figures rather than giving his own opinions, but rather, he is far more self-assertive and expresses his convictions about Lindsey, her care, needs and emotional state with some vigor and decisive options. Although Dr. Peltzer continues to blame his wife for much of the difficulty in their continued relationship over matters relative to Lindsey, he seems to be making some effort to be more objective and considered in his opinions. Finally, he, at least, voices worry over Lindsey's continued immaturity, and its impact on her future development with regard to her emotional state in general as well as her relationships with others including peers." Defendant's Exhibit P, Psychological Report of Dr. Black, dated October 27, 1998. Regarding Mrs. Peltzer, Dr. Black found that she, ". . . continues to be very controlling in her attitude and doesn't question the accuracy of her point of view or position in the least. During this reassessment, Ms. Peltzer was anxious to demonstrate she was giving Dr. Peltzer more access to Lindsey portraying her position in this regard with great vigor and enthusiasm without hinting she had been restrictive in the past. Still, she almost universally projects any responsibility for problems or difficulties onto her husband continuing to view herself as innocent in the evolution of conflict and problems. Her bonding to Lindsey continues to be at a very high level, and she is highly committed to Lindsey's needs, education and the pursuit of her friendships." Id.
In his 1998 report, Dr. Black recommended that the parties share custody of Lindsey but that Dr. Peltzer should have veto power over decisions regarding medical, educational, religious and activity decisions. Additionally, because of his findings regarding Lindsey's immaturity and Mrs. Peltzer's denial of it, Dr. Black recommended that Lindsey spend more time with her father than the alternate weekend, Wednesday schedule the parties have been following. Dr. Black suggested that the parties share CT Page 5848 Lindsey's time equally. Regarding Lindsey's immaturity, Dr. Black commented: "Her self-centeredness, security seeking from adults rather than gaining self-esteem through her accomplishments, proclivity for regression to younger child-like means of coping with anxiety such as stuffed animals, and her tendency to override the boundaries of peers through interruption, silliness, and attempts at humor should all be addressed since they will impede Lindsey's future development." Id. Dr. Black also endorsed continued psychotherapy for Lindsey.
At the time of trial, Dr. Black testified that events subsequent to his 1998 report have only served to reinforce his belief that the parties should equally share time with Lindsey.
The court has carefully considered all the trial evidence and exhibits concerning the issue of Lindsey's custodial placement and relationship with her parents. The court is mindful, as well, that Lindsey prefers the current alternate weekend and Wednesday evening schedule to any change. Given the substantial evidence of Lindsey's immaturity, the court is unpersuaded that Lindsey's spoken choice matches her bests interests. Accordingly, joint custody of Lindsey is awarded to both parties. Her schedule of access to each parent shall be on a two week rotation, as follows:
In week one, starting on Sunday evening at 7pm following dinner at her mother's house, Lindsey shall be picked up by her father and brought to his house. Lindsey shall remain in her father's care for the remainder of week one through Sunday evening at 7pm when she shall be picked up at her father's home by her mother. During week one on Wednesday afternoon, Mrs. Peltzer shall be with her mother from after school until 7pm when she shall be returned to her father's home by Mrs. Peltzer. In week two, while Lindsey is in her mother's care, Dr. Peltzer shall be with Lindsey on Wednesday from after school until 7pm when he shall return Lindsey to her mother's home. During each parent's Wednesday access, the parent to have access shall be responsible for Lindsey's after school transportation. In addition to this two week rotation, the parties shall share equally Lindsey's school vacations during the school year. The parent with whom Lindsey resided in the week prior to a school vacation shall have Lindsey for the second half of the school vacation. During the summer, the two week rotation shall be observed. The court makes no specific provision for major holidays except that the parents shall alternate Christmas day CT Page 5849 with Lindsey, to begin at 8pm on Christmas eve and to end at 4pm on Christmas day. The parent who did not have Christmas with Lindsey in 1998 shall be entitled to be with her in 1999. In view of Lindsey's age, this schedule shall be automatically reviewed by the Family Relations Division on no later than June of 2002. At that time, the Division shall conduct a mediation with the parties to determine whether they are able to fashion a custodial arrangement for Lindsey's teenage years. If not, the matter shall be referred for investigation and report by the Division. For this purpose, a copy of this decision shall be forwarded to the Family Division. This referral is not intended to prevent an earlier referral should circumstances arise which indicate its appropriateness.
The parties are to share decisions regarding Lindsey's educational, medical, and moral upbringing, and activities. They are to consult with each other before decisions are made regarding non-emergency medical care, recurring activities and Lindsey's education. In the event, they are not able to make a joint decision regarding Lindsey's education, Dr. Peltzer shall have the authority to decide except that in the school year 1999-2000 Lindsey shall continue to attend the Renbrook School so long as her attendance there is not discouraged by Renbrook personnel. If the parties are not able to agree concerning tutoring and any other specific educational assistance for Lindsey, Dr. Peltzer shall, have the final determination which shall be adhered to by Mrs. Peltzer while Lindsey is in her care.
Similarly, if the parties are not able to reach accord concerning Lindsey's non emergency health care needs, Dr. Peltzer shall have the final decision making authority.
In making this award of joint custody, the court is mindful that the parties reside in the same neighborhood which is familiar to Lindsey. A move from the neighborhood by either party may constitute a material change of circumstances warranting a review of the custodial arrangement.
Each parent shall keep the other fully informed of any significant issues or information regarding Lindsey and neither shall schedule activities for Lindsey to take place while in the other parent's care without prior consultation and agreement. If, however, Lindsey wishes to participate in an after-school activity such as sports or dance, her wishes shall be recognized and honored by the parties so long as they are not patently CT Page 5850 unreasonable.
As a condition of joint custody, and to increase the likelihood of its success for Lindsey and the parties, the parties are ordered to participate in at least ten parenting counseling sessions to take place no less than once monthly. The purpose of these sessions will be to assist the parties to communicate with each other concerning Lindsey's needs and interests. In the event the parties cannot agree to the designation of a counselor, the court retains jurisdiction to designate one. This counseling shall commence no later than July, 1999 and shall be paid for equally by the parties. It is the court's strong recommendation that Lindsey continue in therapy to assist her in regard to issues discussed in Dr. Black's and Dr. Nelson's reports.
The parties' dispute is not confined to custody issues. They do not agree concerning support, alimony, property division, or fees.
The court heard evidence concerning Dr. Peltzer's earnings and the value of his practice. A review of Dr. Peltzer's 1997 tax return indicates that the gross receipts from his practice were $859,923, and his gross profit was $419,075. For 1996, his gross receipts were $1,133,979 and his taxable profit was $662,457. At trial, he attributed the reduction in earnings in 1998 mainly to a decrease in his hours from forty to thirty-two a week. Dr. Peltzer testified that this reduction is consistent with Dr. Conrad's advice to him to slow his professional life from it's previous hectic pace. As a consequence, he indicated, gross receipts from the practice have been reduced from an average over the past several years in excess of $1,000,000 to the 1997 figure, and there has been a commensurate reduction in his taxable earnings to approximately $312,000 a year.
On her financial affidavit, the plaintiff indicates a weekly need for $2336 including $250 for legal fees and $48 for Renbrook tuition as well as substantial amounts for discretionary expenditures. While the plaintiff is entitled to alimony, she is not incapable of employment. To the contrary, the court credits Dr. Peltzer's testimony that there is a current market for dental hygienists. Dr. Peltzer indicated that the hygienist in his office earns $55,000 annually at the rate of $27 an hour. Though the court does not find that Mrs. Peltzer can earn this amount immediately, it is reasonable to attribute some earning capacity CT Page 5851 to her in her skill area. From the evidence, and mindful of Lindsey's age and the custodial arrangement ordered herein, the court finds that the plaintiff could work part time as a hygienist earning between $30,000 and $20,000 annually. As alimony, the court orders the defendant to pay the plaintiff the weekly sum of $1000 through the last week of January, 2008, to terminate earlier on the death of either party or the remarriage of the plaintiff. The provisions of 46b-86 (b) shall pertain to this order. It is the court's intention that this alimony shall be included as income by Mrs. Peltzer and deductible by Dr. Peltzer for tax purposes. While the court has considered all the criteria set forth in 46b-82 concerning alimony, in setting the duration of alimony the court is particularly mindful of Lindsey's age, the length of the marriage, the age of the parties, the employment and earning capacity of the parties. In framing this order, the court has also taken into consideration the property distribution orders made herein.
As child support, the defendant is ordered to pay the plaintiff $300 a week until Lindsey becomes nineteen or graduates from high school, whichever event first occurs. Additionally, the defendant shall maintain Lindsey as a dependent on his employment-related health care insurance. The parties shall pay equally the cost of health care not covered by insurance or below the present insurance deductible.
In the event Lindsey attends private school, the parties shall share its tuition, books, fees, and activity costs with the defendant paying two-thirds and the plaintiff one-third.
To the extent that it benefits the defendant for tax purposes, he shall be entitled to claim Lindsey as a dependency exemption. However, in any year in which claiming Lindsey affords him no tax advantage, he shall notify the plaintiff by March 1st prior to the tax filing date, and she shall be entitled to claim Lindsey.
The defendant's alimony and child support payments shall be made by direct deposit no later than Friday of each week into an account in the plaintiff's name. For this purpose, the plaintiff shall inform the defendant of the bank address, account name and number immediately.
With respect to assets, the court notes that during the pendency of this action the plaintiff had access to $750,000 CT Page 5852 which she utilized to purchase her home. These funds were derived from two sources: In 1995, without the defendant's knowledge, the plaintiff wrote checks to herself and to others in the aggregate amount of $155,000 for her benefit from the dental practice checking account. A portion of this amount was used by the plaintiff, toward the purchase of her home. The balance, or approximately $700,000 was advanced to the plaintiff from marital assets. The appropriation of these funds by Mrs. Peltzer is the subject of the civil action brought against her by Dr. Peltzer, and, as noted, consolidated with the marital dissolution action. The court finds that while Mrs. Peltzer had legitimate access to the dental practice checking account, it was for the purpose of paying practice bills. Mrs. Peltzer wrongfully converted these dental practice funds for her own use.
At trial, Dr. Peltzer presented two affidavits. On his affidavit dated January 25, 1999, he indicated ownership of various mutual funds, money market funds, bond funds and stocks with an aggregate value of $2,379.305 and Keogh and IRA funds totaling $1,188.151. Following cross examination, Dr. Peltzer submitted another affidavit dated January 29, 1999 in which he posited the total value of the various mutual funds, money market funds, bond funds and stocks to be $2,958.710. He claimed that the difference of approximately $600,000 represented funds he had not remembered when preparing his affidavit. Such "forgetfulness" belies his claim that the appreciation of these liquidities during the period of the parties' separation should not be shared because it was due entirely to his investment acumen. It is far more likely that the appreciation since the parties separation in 1995 has been due to generally rising market conditions in the ensuing years than to any claimed financial prowess on the part of the defendant.
The assets enumerated in sections E and G of the defendant's financial affidavit dated January 29, 1999 are to be divided equally between the parties as are the assets listed in section E of the plaintiff's financial affidavit dated January 25, 1999[1]. Unless the parties agree to a different procedure for division, each asset is to be divided equally so that they will each have the same cost basis in these assets. As to those assets which qualify as tax deferred, one half of those assets shall be transferred either directly into an IRA account established by the plaintiff for her benefit, or by Qualified Domestic Relations Order, as the need may be. All transfers shall be accomplished within forty-five days of this memorandum. CT Page 5853
At trial, the plaintiff offered expert opinion that the defendant's dental practice has a value of $865,000. The defendant contested this value, positing its worth to be substantially lower, approximately $200,000. of the higher amount, the plaintiff's expert, Thom Goracy, stated that approximately $693,000 represented good will. The remainder, or $172,000 represented the value of tangible assets. Thus, according to the method utilized by Mr. Goracy, a substantial portion of the value of the practice is comprised of good will, an element that relates mainly to the personal services performed by the defendant. While the defendant's practice has value, it is also the source of income from which the defendant must pay alimony and child support. Accordingly, the court makes no order for the division of the defendant's dental practice. Additionally, the court considered the defendant's practice in determining the extent of its property distribution and alimony orders.
From the funds received by the plaintiff, she shall reimburse the defendant the net (after-tax) sum of $100,000, representing a portion of the funds she removed from the defendant's dental practice. While the court makes no order for the payment of treble damages since the plaintiff had a colorable equitable claim to the dental practice assets, the plaintiff's surreptitious withdrawal and use of these funds was unwarranted under the circumstances. She should not benefit from her misfeasance. In fixing this amount for repayment, the court has considered the use of the balance of the funds taken by the plaintiff as well as its property distribution orders. In all its property distribution orders, the court has given careful consideration to the evidence and the applicable statutory criteria as set forth in 46b-81.
When the defendant opened his practice at its present location, he purchased the land on which the building is situated and the property was placed in his name, his fathers, and the plaintiffs. The defendant represented at trial that the fair market value of this property is $180,000, and that the plaintiff has a 10% interest. The plaintiff shall quit claim her right, title and interest in this property to the defendant in return for the sum of $15,000 which shall be paid to the plaintiff by the defendant. This transaction shall take place within thirty days of this memorandum. CT Page 5854
The parties shall be entitled to sole ownership of the homes in which they reside. Toward that end, in the event either party's name is on the title to the other's property, he or she shall quit claim his or her interest in and to such property to the other within thirty days of this memorandum.
Each party shall be entitled to exclusive ownership of the personal property each possesses. Any documents necessary to effectuate this order shall be signed within thirty days.
The defendant shall retain his interest in Bayberry Associates free from any claim of the plaintiff. To the extent she shares any interest in this asset, she shall quit claim it to the defendant within thirty days of this memorandum and to the extent she shares any liabilities in conjunction with it, the defendant shall save and hold her harmless.
The plaintiff seeks counsel fees based on her fee agreement with counsel. While the parties have stipulated that counsel's hourly rate of $195 is reasonable, it is the defendant's position that the plaintiff's fees are unreasonably elevated because she has been unnecessarily litigious. There is some merit to this claim. The acrimony between the parties, and particularly on the part of the plaintiff, appears boundless. While a party who is economically disadvantaged may be entitled to an award of counsel fees, they must be reasonably incurred. Additionally, a party who has adequate liquidity to pay his or her own fees may not be entitled to an award of fees unless a refusal to award fees would frustrate the purposes of the court's property distribution orders. Given the magnitude and liquidity of the assets allocated to the plaintiff herein, the court finds that the plaintiff is able to pay her own counsel fees without so diminishing her assets so as to frustrate the court's purposes in its property distribution order. No award of counsel fees is made to either party.
In framing the orders herein, the court has carefully considered the evidence and applicable statutory and decisional law. Counsel for the plaintiff shall prepare the judgment file. Judgment may enter accordingly.
Bishop, J.